# United States Court of Appeals
## For the First Circuit

Nos. 14-1270, 14-1803,
    14-1823

MARK ANTHONY REID,

Petitioner, Appellee/Cross-Appellant,

v.

CHRISTOPHER DONELAN, Sheriff, Franklin County, Massachusetts;
DAVID A. LANOIE, Superintendent, Franklin County Jail and House
of Correction; THOMAS M. HODGSON, Sheriff, Bristol County,
Massachusetts; JOSEPH D. MCDONALD, JR., Sheriff, Plymouth
County, Massachusetts; STEVEN W. TOMPKINS, Sheriff, Suffolk
County, Massachusetts; JEH CHARLES JOHNSON, United States
Secretary of Homeland Security; DOROTHY HERRERA-NILES, Director,
Immigration and Customs Enforcement, Boston Field Office;
JOHN T. MORTON, Director of Immigration and Customs Enforcement;
ERIC H. HOLDER, JR., Attorney General; JUAN OSUNA, Director of
the Executive Office for Immigration Review;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,

Respondents, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Stahl, Circuit Judges.

Elianis N. Perez, Senior Litigation Counsel, with whom Joyce Branda, Acting Assistant Attorney General, Civil Division, William C. Peachey, Director, Office of Immigration Litigation, District Court Section, Colin A. Kisor, Deputy Director, and Regan Hildebrand, Senior Litigation Counsel, Officer of Immigration Litigation, District Court Section, were on brief, for appellant.

Anant K. Saraswat and Swapna C. Reddy, Law Student Intern, with whom Mark C. Fleming, Wilmer Cutler Pickering Hale and Dorr LLP, Ahilan T. Arulanantham, Michael Tan, ACLU Immigrants' Rights Project, Nicole Hallett, Supervising Attorney, Michael Wishnie, Supervising Attorney, Conchita Cruz, Law Student Intern, Grace Kao, Law Student Intern, Lunar Mai, Law Student Intern, My Khanh Ngo, Law Student Intern, Ruth Swift, Law Student Intern, and Jerome N. Frank Legal Services, were on brief, for appellee.

----------------

April 13, 2016

----------------

**STAHL**, **Circuit Judge**. Under 8 U.S.C. § 1226(c), aliens who have committed certain criminal offenses are subject to mandatory detention after serving their criminal sentence and pending their removal proceedings. Petitioner, a lawful permanent resident, committed such offenses, served his sentence, and then was held under § 1226(c) without an individualized showing that he posed a flight risk or danger to society and without an opportunity to seek release on bond. After eight months, Petitioner challenged his continuing detention and filed a class action on behalf of himself and similarly situated noncitizens held for over six months.

The district court held that detention pursuant to § 1226(c) for over six months was presumptively unreasonable and granted summary judgment to the class, thereby entitling each class member to a bond hearing. With respect to Petitioner, the court also held, in the alternative, that the individualized circumstances of his case rendered his detention unreasonable. Finally, the court declined to mandate certain procedural protections for the class members' bond hearings. We affirm the judgment with respect to Petitioner, vacate the judgment with respect to the class members, and remand the class action for reconsideration of the district court's class certification.

## I. Facts & Background

The U.S. Department of Homeland Security ("DHS") generally has the discretionary authority to detain an alien during removal proceedings. 8 U.S.C. § 1226(a). An alien that U.S. Immigration and Customs Enforcement ("ICE") decides to detain under § 1226(a) may seek a bond hearing before an immigration judge ("IJ") to show that he or she is not a flight risk or a danger. 8 C.F.R. § 236.1(c)(8). For aliens who have committed certain criminal or terrorist offenses, however, Congress made detention during removal proceedings mandatory, except for witness protection purposes. 8 U.S.C. § 1226(c).

Mark Anthony Reid ("Reid" or "Petitioner") came to the United States in 1978 as a lawful permanent resident. Between 1978 and 1986, Reid served in the U.S. Army, pursued post-secondary education, was employed as a loan originator, worked in construction, and owned and rented several properties. Following a conviction for narcotics possession in 1986, however, Reid amassed an extensive criminal record, including larceny, assault, drug and weapon possession, failure to appear, interfering with an officer, driving on a suspended license, selling drugs, violation of probation, and burglary.

After being released from criminal custody on November 13, 2012, Reid was detained by ICE under § 1226(c) without bond pending immigration removal proceedings. Reid conceded the factual allegations underlying his removability charges, but sought relief from removal on two grounds: (1) that the Convention Against Torture ("CAT") applied, and (2) that removal was a disproportionate punishment for his crimes.

At several IJ hearings held between February 13, 2013 and March 11, 2013, Reid presented evidence in support of his application for relief from removal. On April 5, 2013, the IJ denied Reid's application and ordered him removed to Jamaica. Reid filed a notice of appeal to the Board of Immigration Appeals ("BIA") on May 5, 2013. On October 23, 2013, nearly half a year after the IJ's decision and nearly a full year after Reid's detention began, the BIA reversed and remanded the case for further proceedings related to Reid's CAT claim. On December 17, 2013, the IJ again denied Reid's CAT claim. Reid appealed again and, on December 29, 2014, the BIA found error and remanded the case once more.

Between his first appeal and the BIA's first remand, Reid filed the present habeas corpus petition along with a class-action complaint in the United States District Court for

the District of Massachusetts. Reid contends that he and other similarly situated noncitizens cannot be held under § 1226(c) in prolonged detention without an individualized bond hearing to ascertain individual flight or safety risk. Reid argues that § 1226(c) contains an implicit "reasonableness" requirement and should be read to authorize mandatory detention only up to six months, at which time the government must provide a bond hearing. At the bond hearing, Reid argues, the government must bear the burden of presenting clear and convincing evidence that detention remains necessary. What is more, Reid contends that the government must employ the least restrictive means available to prevent the alien's flight or danger to the community.

On January 9, 2014, the district court granted Reid's habeas petition and held that § 1226(c) only authorizes mandatory detention for a reasonable period of time. Reid v. Donelan (Reid I), 991 F. Supp. 2d 275, 278-79 (D. Mass. 2014). The court further held that detention over six months was presumptively unreasonable absent individualized justification. Id. at 279-81. The court also noted that even if no such presumption applied, the individualized circumstances of Reid's case rendered his continued detention unreasonable. Id. at 281-82. The court ordered the government to set a hearing and to

determine whether conditions could be placed upon Reid's release to reasonably account for any flight or safety risks. Id. at 282. On February 25, 2014, Reid posted bond and was released after 400 days of civil detention, subject to electronic monitoring, monthly reporting, and other conditions.

On May 27, 2014, the district court granted summary judgment in the related class action and ordered bond hearings for all class members. Reid v. Donelan (Reid II), 22 F. Supp. 3d 84, 93-94 (D. Mass. 2014). The court reiterated its holding that § 1226(c) only justifies mandatory detention for a period of six months, at which time the detention becomes presumptively unreasonable absent an individualized showing at a bond hearing. Id. at 88. However, the court declined to adopt any specific procedural protections for the bond hearings themselves. Id. at 92-93. The court observed that aliens detained under § 1226(a) bore the burden of proof at their bond hearings, and "individuals who committed a § 1226(c) predicate offense should not receive more protections than § 1226(a) detainees." Id. at 92.

The government appeals the lower court's determination that § 1226(c) contains an implicit reasonableness requirement, that any detention under § 1226(c) is presumptively unreasonable

after six months, and that Reid's specific detention had become unreasonable. Reid cross-appeals the lower court's class determination that bond hearings for aliens held pursuant to § 1226(c) do not require specific procedural protections.

## II. Analysis

Until the late 1980s, the Attorney General had broad authority to take aliens into custody during their removal proceedings and to release those aliens in his discretion. See Demore v. Kim, 538 U.S. 510, 519 (2003) (citing 8 U.S.C. § 1252(a) (1982)). Over time, Congress became concerned that criminal aliens too often obtained release and were thereby able to evade removal and continue committing crimes. See id. at 518-21. In response, "Congress limited the Attorney General's discretion over custody determinations with respect to deportable aliens who had been convicted of aggravated felonies" and then expanded the definition of "aggravated felonies" in subsequent legislation to subject more criminal aliens to mandatory detention. Id. at 520-21. "At the same time, however, Congress . . . authorize[d] the Attorney General to release permanent resident aliens during their deportation proceedings where such aliens were found not to constitute a flight risk or threat to the community." Id. at 521.

- 7 -

The current take on this mandatory detention theme can be found in 8 U.S.C. § 1226(c), which requires the Attorney General[1] to take criminal aliens into custody "when released"[2] from criminal custody and only permits the release of such aliens for limited witness protection purposes. See 8 U.S.C. § 1226(c). Whatever the merits of this approach may be as a matter of policy, we must ensure that the statute falls within constitutional limits.

The constitutionality of the categorical detention scheme embodied in § 1226(c) was first put to the test in Demore. In Demore, the petitioner launched a broad attack on the statute, arguing "that his detention under § 1226(c) violated due process because the [government] had made no determination that he posed either a danger to society or a

---

[1] Although the relevant statutory sections refer to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), transferred all immigration enforcement and administration functions vested in the Attorney General, with few exceptions, to the Secretary of Homeland Security.

[2] The instant case asks what § 1226(c) requires after a criminal alien has been brought into custody. This case does not touch upon what the statute requires at the commencement of such detention. This circuit recently considered the meaning of the statute's "when . . . released" provision in Castañeda v. Souza, 810 F.3d 15 (1st Cir. 2015) (en banc).

flight risk." 538 U.S. at 514. In other words, the petitioner argued that his detention was unconstitutional from the outset due to the categorical nature of the mandatory detention regime.

The Supreme Court rejected the challenge and upheld the statute in a narrowly framed ruling. The Court recognized the constitutional pressures at play, calling it "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." Id. at 523 (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)). Yet, the Court also noted that "[d]etention is necessarily a part of [the] deportation procedure," id. at 524 (alteration in original) (quoting Carlson v. Landon, 342 U.S. 524, 538 (1952)), and that Congress may employ "reasonable presumptions and generic rules" when legislating with respect to aliens, id. at 526 (quoting Flores, 507 U.S. at 313). Accordingly, the Court left a limited degree of constitutional space to Congress' categorical judgment that, "even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight." Id. at 520.

The "limited" scope of this categorical sanction, however, was plainly evident. The Court made the brevity of the detention central to its holding: "We hold that Congress,

justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained <u>for the brief period necessary for their removal proceedings</u>." <u>Id.</u> at 513 (emphasis added). This was no passing remark. <u>See</u> <u>id.</u> at 526 ("[T]he Government may constitutionally detain deportable aliens during <u>the limited period</u> necessary for their removal proceedings." (emphasis added)). Indeed, the Court took pains to point out the specific durations that it envisioned were encompassed by its holding: "[T]he detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." <u>Id.</u> at 530.

In a concurring opinion, Justice Kennedy drove the point of temporal limitations home, noting that an alien "could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." <u>Id.</u> at 532 (Kennedy, J., concurring). "Were there to be an unreasonable delay by the [government] in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention

is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." Id. at 532-33.

The case before us tests the assumption upon which Demore was based, and asks whether Congress may employ categorical, mandatory detention for "the period necessary for removal proceedings" when that period turns out not to be so "brief" after all.

The concept of a categorical, mandatory, and indeterminate detention raises severe constitutional concerns. "Freedom from imprisonment--from government custody, detention, or other forms of physical restraint--lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Because of the limited nature of the holding in Demore, every federal court of appeals to examine § 1226(c) has recognized that the Due Process Clause imposes some form of "reasonableness" limitation upon the duration of detention that can be considered justifiable under that statute. See Lora v. Shanahan, 804 F.3d 601, 606 (2d Cir. 2015); Rodriguez v. Robbins (Rodriguez I), 715 F.3d 1127, 1138 (9th Cir. 2013); Diop v. ICE/Homeland Sec., 656 F.3d 221, 232-33 (3d Cir. 2011); Ly v. Hansen, 351 F.3d 263, 269-70 (6th Cir.

2003).  And, each circuit has found it necessary to read an implicit reasonableness requirement into the statute itself, generally based on the doctrine of constitutional avoidance. See Lora, 804 F.3d at 614; Rodriguez I, 715 F.3d at 1138; Diop, 656 F.3d at 235; Ly, 351 F.3d at 270.

This is not, as the government contends, contrary to congressional intent.  "[C]ourts interpret statutes with the presumption that Congress does not intend to pass unconstitutional laws."  Diop, 656 F.3d at 231.  In this case, "while Congress did express a desire to have certain criminal aliens incarcerated during removal proceedings, it also made clear that such proceedings were to proceed quickly."  Ly, 351 F.3d at 269; see also Diop, 656 F.3d at 235 ("We do not believe that Congress intended to authorize prolonged, unreasonable[] detention without a bond hearing.").  This reading similarly accords with Demore's authorization of only a "brief" or "limited" detention, 538 U.S. at 513, 526, and Justice Kennedy's stipulation that an individualized determination would become necessary "if the continued detention became unreasonable or unjustified," id. at 532 (Kennedy, J., concurring).

Yet, the courts of appeals have split on the method for enforcing this statutory reasonableness requirement.  The

Third and Sixth Circuits have held that individualized review is necessary in order to determine whether the detention has become unreasonable.  See Diop, 656 F.3d at 233 (noting that the inquiry into whether detention has become unreasonable "will necessarily be a fact-dependent inquiry that will vary depending on individual circumstances" and "declin[ing] to establish a universal point at which detention will always be considered unreasonable"); Ly, 351 F.3d at 271 ("A bright-line time limitation . . . would not be appropriate . . . . [C]ourts must examine the facts of each case[] to determine whether there has been unreasonable delay in concluding removal proceedings."). "Under this approach, every detainee must file a habeas petition challenging detention, and the district courts must then adjudicate the petition to determine whether the individual's detention has crossed the 'reasonableness' threshold, thus entitling him to a bail hearing."  Lora, 804 F.3d at 614; see also Ly, 351 F.3d at 272.

The Second and Ninth Circuits, on the other hand, have "appl[ied] a bright-line rule to cases of mandatory detention" and have held that "the government's 'statutory mandatory detention authority under Section 1226(c) . . . [is] limited to a six-month period, subject to a finding of flight risk or

dangerousness.'" Lora, 804 F.3d at 614 (alterations in original) (quoting Rodriguez I, 715 F.3d at 1133). Under this interpretation, every alien held pursuant to § 1226(c) must be provided a bond hearing once his or her detention reaches the six-month mark, because any categorical and mandatory detention beyond that timeframe is presumptively unreasonable. Id. at 616. The detainee may continue to be held if an IJ determines that the individual does, in fact, pose a flight risk or danger to society, but the categorical nature of the detention expires. Id.

In this circuit split, we sense a tension between legal justifications and practical considerations. From a strictly legal perspective, we think that the Third and Sixth Circuits have the better of the argument. This view is informed by our analysis regarding the source of the six-month rule, the nature of the reasonableness inquiry itself, and the circumstances surrounding the Supreme Court's Demore decision.

To justify employing a six-month presumption, the Second and Ninth Circuits point to the Supreme Court's decision in Zadvydas. There, the Court was faced with a particularly thorny problem. Aliens who had been deemed unlawfully present, had completed removal proceedings, and had a final removal order

entered against them were subject to detention during a 90-day statutory "removal period" while the government secured their physical removal from the country. 533 U.S. at 682. If the government failed to remove the alien from the country during this time period, the government could continue to detain them for successive periods so long as they posed a risk to the community or were unlikely to comply with the order of removal when such physical removal became possible. Id. The trouble arose when, for one reason or another, there was simply no country willing to accept the alien and no reasonably foreseeable point at which the detained individual would ever be released from this theoretically interim detention. Id. at 684-86. The question thus became "whether [the] post-removal-period statute authorize[d] the Attorney General to detain a removable alien indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal." Id. at 682.

There, as here, the solution was to read an implicit reasonableness limitation into the statute to avoid constitutional conflict. Id. at 689. The Court held that "if removal is not reasonably foreseeable," then "continued detention . . . [is] no longer authorized by [the] statute."

- 15 -

<u>Id.</u> at 699-700. The Court then went one step further and adopted a six-month presumption: "After [a] [six]-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." <u>Id.</u> at 701.

Although it is tempting to transplant this presumption into § 1226(c) based on the superficial similarities of the problems posed, such a presumption has no place here. Unlike the "post-removal-period detention" at issue in <u>Zadvydas</u>, which had "no obvious termination point," a "detention pending a determination of removability" under § 1226(c) has "a definite termination point." <u>Demore</u>, 538 U.S. at 529 (quoting <u>Zadvydas</u>, 533 U.S. at 697). Just because the conclusion of removal proceedings may not be imminent does not mean the conclusion is not reasonably foreseeable. Why does this distinction matter? Because the six-month presumption developed in <u>Zadvydas</u> would never be triggered under the circumstances found here.

In adopting a bright-line six-month rule, the Second and Ninth Circuits have looked past the primary lesson of <u>Zadvydas</u> and fixated on a secondary, backup rule. In <u>Zadvydas</u>, the Court read an implicit reasonableness limitation into the

- 16 -

statute and then noted that judges evaluating such cases "should measure reasonableness primarily in terms of the statute's basic purpose." 533 U.S. at 699. When faced with a detention with no reasonably foreseeable end, the statute's purpose--"namely, assuring the alien's presence at the moment of removal"--was drawn into doubt, making continued detention "unreasonable and no longer authorized by [the] statute." Id. at 699-700.

This primary holding was then buttressed by a secondary bright-line six-month rule. The Court pointed out that not every alien to be removed would be released after six months. "To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 701. If six months had passed and the alien had demonstrated "no significant likelihood of removal in the reasonably foreseeable future," then the government was required to "respond with evidence sufficient to rebut that showing." Id. If the government could demonstrate a reasonably foreseeable termination point, the detention continued.

Thus, the secondary six-month rule was predicated on there being no foreseeable hope of removal. Unlike in this case, the confinement at issue in Zadvydas was "potentially

- 17 -

permanent." Id. at 691. Because the detention in such cases had to stop at some point, and there were simply no metrics by which to judge just how much longer towards eternity could be considered "reasonable," a bright-line rule was warranted. That is why we think it inappropriate to import the six-month presumption from Zadvydas into a statute where individualized reasonableness review remains feasible.

This brings us to the character of the "reasonableness" inquiry itself. As the Diop court pointed out, "[r]easonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case." 656 F.3d at 234. The reasonableness of continued detention under § 1226(c) must be measured "primarily in terms of the statute's basic purpose." Zadvydas, 533 U.S. at 699. Although the statute's purpose at first glance is to protect public safety and ensure that aliens appear for their removal proceedings, we think the purpose is a bit more nuanced than that. If an individualized determination of flight and safety risk were sufficient, for example, there would be little reason to pass § 1226(c) at all.

Instead, the statute was passed "against a backdrop of wholesale failure by the INS to deal with increasing rates of

criminal activity by aliens" and "near-total inability to remove deportable criminal aliens" due to "the agency's failure to detain [such] aliens during their deportation proceedings." Demore, 538 U.S. at 518-19. Thus, the animating force behind § 1226(c) is its categorical and mandatory treatment of a certain class of criminal aliens. Measuring reasonableness by this basic purpose requires a different inquiry than the flight-and-safety-risk evaluation conducted in an individualized bond hearing. Therefore, arguing that aliens receive the equivalent of an individualized "reasonableness" review at their bond hearings entails a certain judicial sleight-of-hand. See Rodriguez I, 715 F.3d at 1139. It is a supposed finding of "unreasonableness" under the implicit statutory limitation that entitles the alien to a bond hearing in the first place. In other words, while the Second and Ninth Circuits claim to have read an implicit "reasonableness limitation" into § 1226(c), we think it more accurate to say that they have simply read an implicit "six-month expiration" into § 1226(c).

Finally, we view Demore as implicitly foreclosing our ability to adopt a firm six-month rule. In Demore, the Supreme Court declined to state any specific time limit in a case involving a detainee who had already been held for approximately

six months.  See 538 U.S. at 530-31 (noting that most removal proceedings usually require one to five months, and that the respondent had been "detained for somewhat longer than the average – spending six months in INS custody prior to the . . . habeas relief"); Ly, 351 F.3d at 271 (noting that Demore "specifically authorized such detention in the circumstances there").  The Demore Court also briefly discussed facts specific to the detainee, such as his request for a continuance of his removal hearing.  538 U.S. at 531 & n.15.  Taken together, Zadvydas, Demore, and the inherent nature of the "reasonableness" inquiry weigh heavily against adopting a six-month presumption of unreasonableness.

From a more practical standpoint, however, the approach employed by the Third and Sixth Circuits has little to recommend it.  Reid and his amici point to a plethora of problems raised by the method.  First, the approach has resulted in wildly inconsistent determinations.  See Lora, 804 F.3d at 615 (collecting cases and noting that "the pervasive inconsistency and confusion exhibited by district courts . . . when asked to apply a reasonableness test on a case-by-case basis weighs, in our view, in favor of adopting an approach that affords more certainty and predictability").

Second, the failure to adopt a bright-line rule may have the perverse effect of increasing detention times for those least likely to actually be removed at the conclusion of their proceedings. See Rodriguez v. Robbins (Rodriguez II), 804 F.3d 1060, 1072 (9th Cir. 2015) ("Non-citizens who vigorously pursue claims for relief from removal face substantially longer detention periods than those who concede removability."). Moreover, federal habeas litigation itself is both complicated and time-consuming, especially for aliens who may not be represented by counsel. See Lora, 804 F.3d at 615 ("[A six-month] rule avoids the random outcomes resulting from individual habeas litigation in which some detainees are represented by counsel and some are not, and some habeas petitions are adjudicated in months and others are not adjudicated for years.").

Third, even courts that have adopted the individualized habeas approach have questioned the federal courts' "institutional competence" to adjudicate these issues and the consequences of such an interpretation. See Ly, 351 F.3d at 272 (noting that the habeas approach raises "a question of institutional competence" since "federal courts are obviously less well situated to know how much time is required to bring a

removal proceeding to conclusion"). As the Third Circuit has lamented, federal courts are faced with a "moving target" in such cases because petitioners presumably cannot challenge their detention until it becomes unreasonable, but, even if the petitioner prematurely lodges a challenge, the detention may become unreasonable during the pendency of the claim. See Diop, 656 F.3d at 227.

Moreover, the federal courts' involvement is wastefully duplicative. Not only may "the underlying removal proceedings justifying detention . . . be nearing resolution by the time a federal court of appeals is prepared to consider them," id., but it is also likely that the evidence and arguments presented in a "reasonableness" hearing before a federal court are likely to overlap at the margins with the evidence and arguments presented at a bond hearing before an immigration court. This inefficient use of time, effort, and resources could be especially burdensome in jurisdictions with large immigration dockets. See Lora, 804 F.3d at 615-16.

Finally, Reid and his amici stress the harms suffered by detainees and their families when detainees are held in prolonged detention. While perhaps beyond our judicial cognizance, we do not mean to diminish the real, human

consequences of being held for prolonged periods of time in civil confinement away from family, friends, and loved ones.

Despite the practical advantages of the Second and Ninth Circuits' approach, however, we have surveyed the legal landscape and consider ourselves duty-bound to follow the trail set out by the Third and Sixth Circuits. A bright-line rule may offer significant benefits, but these are persuasive justifications for legislative or administrative[3] intervention, not judicial decree. In the end, we think the Third and Sixth Circuits' individualized approach adheres more closely to legal precedent than the extraordinary intervention requested by Petitioner.

In conducting this individualized reasonableness inquiry, the district court must evaluate whether the alien's continued detention sufficiently serves the categorical purpose of the statute. This is not, as the government contends, simply

---

[3] To be clear, it is quite possible that the government is less captive to § 1226(c)'s categorical command than it believes. Because we read an implicit reasonableness limitation into the statute itself, the statute authorizes a bond hearing as soon as continued, mandatory detention has reached the point of being constitutionally unreasonable. Whether (and how) the government may rely upon this implicit component of the statute to streamline its detention procedures for aliens who have been detained under § 1226(c) for a prolonged period of time poses a question for another day.

a question of asking "whether there are significant, unjustifiable delays in the proceedings ordered at the government's request or other evidence demonstrating that the government is not actively engaged in prosecution of the removal case."

The government's view of reasonableness fails for two reasons. First, while the Demore Court did not find any specific duration dispositive, the holding was premised on the notion that proceedings would be resolved within a matter of months, including any time taken for appeal by the detainee. See 538 U.S. at 529. The majority emphasized that "[t]he very limited time of the detention at stake under § 1226(c) [was] not missed by the dissent," which referred to proceedings taking "several months." Id. at 529 n.12. The majority then employed a "but see" citation with respect to the dissent's warning that § 1226(c) could result in a "potentially lengthy detention." Id. Thus, the Demore majority disclaimed any suggestion that its decision somehow sanctioned categorical custody beyond a matter of months.

The Third Circuit's Diop decision provides a clear example of why the government's reading must fail. In that case, "[t]he Government doggedly pursued Diop's detention and

removal for three years." Diop, 656 F.3d at 228. The government did not "delay" proceedings, and yet the detention still reached an unreasonable duration. As that court noted, "individual actions by various actors in the immigration system, each of which takes only a reasonable amount of time to accomplish, can nevertheless result in the detention of a removable alien for an unreasonable . . . period of time." Id. at 223. Total duration matters to a person held in civil confinement, and due process demands a better answer than "we haven't gotten around to it yet."

The second problem with the government's suggested reading is its failure to focus on the categorical nature of the detention. While detention under § 1226(c) undoubtedly prevents flight and protects the public, this argument involves the same stratagem used by the Ninth Circuit in finding bond hearings sufficient to satisfy the implicit reasonableness requirement. The basic purpose of § 1226(c) is not merely flight and danger prevention. After all, an alien who, at a bond hearing, is found likely to abscond or harm society could clearly remain in detention. The specific purpose of § 1226(c) is to categorically deny bond hearings to a class of aliens who may pose these threats. An inquiry into the reasonableness of

categorical detention must, therefore, be measured by reference to Congress' use of "reasonable presumptions and generic rules" about danger and flight risk. Demore, 538 U.S. at 526 (quoting Flores, 507 U.S. at 313).

Categorical detention is only permitted for a short time as "a constitutionally valid aspect of the deportation process." Id. at 523 (emphasis added). As Justice Kennedy noted in his Demore concurrence, the government's categorical denial of bond hearings is premised upon the alien's presumed deportability and the government's presumed ability to reach the removal decision within a brief period of time. See id. at 531 (Kennedy, J., concurring) ("While the justification for 8 U.S.C. § 1226(c) is based upon the Government's concerns over the risks of flight and danger to the community, the ultimate purpose behind the detention is premised upon the alien's deportability." (citation omitted)); see also Ly, 351 F.3d at 271-72 ("The actual removability of a criminal alien . . . has bearing on the reasonableness of his detention prior to removal proceedings."). In other words, there is a difference between the "foreseeability" of proceedings ending and the "foreseeability" of proceedings ending adversely. As the

likelihood of an imminent <u>removal</u> order diminishes, so too does the government's interest in detention <u>without a bond hearing</u>.

Thus, a court looking to measure the reasonableness of continued categorical detention must examine the presumptions upon which that categorical treatment was based (such as brevity and removability). As the actualization of these presumptions grows weaker or more attenuated, the categorical nature of the detention will become increasingly unreasonable. For example, a court might examine, <u>inter alia</u>, the total length of the detention; the foreseeability of proceedings concluding in the near future (or the likely duration of future detention); the period of the detention compared to the criminal sentence; the promptness (or delay) of the immigration authorities or the detainee; and the likelihood that the proceedings will culminate in a final removal order.[4]

---

[4] These non-exhaustive factors are similar to those advanced by the <u>Ly</u> court. <u>See</u> <u>Flores-Powell</u> v. <u>Chadbourne</u>, 677 F. Supp. 2d 455, 471 (D. Mass. 2010) (summarizing the factors from <u>Ly</u>, 351 F.3d at 271-72, that are suggestive of unreasonable delay: "(1) the overall length of detention; (2) whether the civil detention is for a longer period than the criminal sentence for the crimes resulting in the deportable status; (3) whether actual removal is reasonably foreseeable; (4) whether the immigration authority acted promptly to advance its interests; and (5) whether the petitioner engaged in dilatory tactics in the Immigration Court").

Two clarifications are worth noting here. First, there is a difference between "dilatory tactics" and the exercise of an alien's rights to appeal. As the Ly court noted:

> [A]ppeals and petitions for relief are to be expected as a natural part of the process. An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him. Further, although an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take. The mere fact that an alien has sought relief from deportation does not authorize the INS to drag its heels indefinitely in making a decision. The entire process, not merely the original deportation hearing, is subject to the constitutional requirement of reasonability.

351 F.3d at 272. In Demore, the Supreme Court held that detention for a number of months remains appropriate "in the minority of cases in which the alien chooses to appeal." 538 U.S. at 530 (emphasis added). When an alien appeals, and the appeal occurs within this limited timeframe, a presumption of removability remains and a presumption of promptness remains. Although there may come a time when promptness lapses, aliens may be detained for "several months" before this point is reached. Id. at 529 n.12. Of course, the same logic would not apply if a detainee prevails before an IJ and the government appeals. In such cases, the presumption of ultimate removability is weakened, rendering the alien's continued categorical detention far less reasonable. (Of course, an IJ might still find such an alien too risky to release at an individualized bond hearing.)

Second, we think it worth noting that the Ninth Circuit, in Rodriguez II, recently rejected a proposal that an IJ consider "the likely duration of future detention and the likelihood of eventual removal" at bond hearings because consideration of

- 28 -

There may be other factors that bear on the reasonableness of categorical detention, but we need not strain to develop an exhaustive taxonomy here. We note these factors only to help resolve the case before us and to provide guideposts for other courts conducting such a reasonableness review.

Applying the rule we have adopted today to the case at bar, we affirm the district court's individualized holding with respect to Reid's particular habeas petition. In its alternative holding, the district court weighed "the length of detention; the period of detention compared to the criminal sentence; the foreseeability of removal; the prompt action of immigration authorities; and whether the petitioner engaged in any dilatory tactics." Reid I, 991 F. Supp. 2d at 281. The court also noted that Reid had been detained for fourteen months, which was "well beyond the brief detainment contemplated in Demore." Id. These factors aptly anticipated those

---

those factors "would require legal and political analyses beyond what would otherwise be considered at a bond hearing." 804 F.3d at 1089. While we agree that these factors are not relevant at a bond hearing, where the focus is on the alien's flight and safety risk, these factors are relevant when a federal court is conducting a reasonableness inquiry and determining whether a bond hearing needs to be held in the first place.

articulated above, and we agree with the district court's holding that Reid's detention had become unreasonable under § 1226(c).

Moreover, Reid's case had already been through one round of appeals and was pending another round at the time of the lower court's decision, making final resolution "certainly far enough out to implicate due process concerns." Id. at 282. None of these appeals involved "dilatory tactics." Id. Rather, Reid "raised a colorable claim against deportation and . . . vigorously contest[ed] removal." Id. Finally, it should be noted that although the IJ's initial order was adverse to Reid, the BIA's first decision, rendered almost a year after detention began, reversed and remanded the IJ's determination, drawing into question Reid's presumed deportability.

With respect to the class claims, however, we must vacate the district court's summary judgment decision. The district court certified a class consisting of "[a]ll individuals who are or will be detained within the Commonwealth of Massachusetts pursuant to 8 U.S.C. § 1226(c) for over six months and have not been afforded an individualized bond hearing." Reid v. Donelan, 297 F.R.D. 185, 194 (D. Mass. 2014). The court subsequently granted summary judgment to this class on

the basis of its previous decisions adopting the six-month bright-line rule.  See Reid II, 22 F. Supp. 3d at 88-89.  It then examined the appropriate relief, which included a request by Reid that the court mandate certain procedural protections at bond hearings--protections that exceed those currently contemplated by regulations implementing bond hearings under 8 U.S.C. § 1226(a).  The court declined to impose these additional procedural protections, concluding that due process did not require them.  See id. at 92-93.  Reid cross-appeals this conclusion, offering a bevy of weighty constitutional arguments.

Yet, Reid's personal situation does not warrant adjudication of these constitutional questions.  Reid received a bond hearing pursuant to the district court's order and was granted bond.  He has thus suffered no cognizable harm attributable to the challenged procedures, and the claim persists only with respect to the class that Reid represents. The problem, however, is that the district court's adoption of the bright-line rule was an essential predicate to class certification.  Our ruling today, requiring an individualized approach, removes that predicate.  The class is thus substantially overbroad in light of our disposition.

When a class representative lacks a live claim, and changes in the law--whether through legislative enactment, see Kremens v. Bartley, 431 U.S. 119, 130 (1977), or judicial decision, see Hartman v. Duffey, 19 F.3d 1459, 1470, 1474-75 (D.C. Cir. 1994)--cast substantial doubt on the composition of the class, it is appropriate to remand for reconsideration of the class certification. This prudential procedure recognizes that serious concerns about premature adjudication of constitutional questions arise where the legitimacy of a class is called into question by changes in the law. See Kremens, 431 U.S. at 128, 136-37; Smook v. Minnehaha County, 457 F.3d 806, 815 (8th Cir. 2006). Those concerns are heightened where, as here, we lack information about the status of the unnamed class members, including whether they have been afforded bond hearings, whether any of them have been denied bond under the challenged procedures, and the justification for those denials. Remand (rather than dismissal) is also fairer to the class members, especially since the government has not appealed the class certification order, and we have no briefing from the parties about the impact our case-by-case rule has on the class as a whole.

On remand, the district court may consider whether it is feasible to redefine the class, excluding those class members with moot claims and substituting class representatives with live claims as appropriate.  See Fed. R. Civ. P. 23; Kremens, 431 U.S. at 134-35; Hartman, 19 F.3d at 1474.  It may well be that no suitable class can be formed, and that the due process concerns presented by the bond procedures must be raised by an individual denied bond under these standards, in which case decertification of the present class is the appropriate course. See Smook, 457 F.3d at 815.

In concluding, we wish to emphasize that our decision to read an implicit reasonableness requirement into § 1226(c) cannot be read so broadly as to unwind § 1226(c)'s mandatory detention requirement.  There is no doubt that a challenge like Demore's would still fail today.  Categorical and mandatory detention for a brief, reasonable duration remains constitutional, and any challenge to such detention at the outset or early stages of categorical custody must be dismissed without hesitation.  As long as the statute remains in effect, Demore so requires.

Yet, at a certain point the constitutional imperatives of the Due Process Clause begin to eclipse the claimed

justifications for such bridling custodial power.  When the duration of this categorical custody exceeds reasonable bounds, the implicit terms of the statute disclaim any pretense to bolster the state's unconstitutional bidding.[5]

### III.  Conclusion

For the foregoing reasons, the judgment is AFFIRMED as to Reid and VACATED as to the class members.  Because we reject the six-month presumption underlying the class certification and judgment, the class action is REMANDED for reconsideration of the certification order in a manner consistent with this decision.

---

[5] Because our affirmance in this case is limited to the particular facts presented by Reid's petition, we have no occasion to consider here whether another petitioner might be able to challenge the individualized reasonableness of his continued categorical detention before the immigration courts rather than the federal courts.  The regulatory and statutory regime does not explicitly address the propriety of such an approach, and the parties before us have not fully briefed or argued the issue.  Given the shortcomings of case-by-case habeas review identified above, however, it would be appropriate for the executive (or the legislature, as the case may be) to consider explicitly permitting detainees in the position of the petitioner to seek a reasonableness review before a federal court or before an IJ more familiar with the intricacies of the case and the particulars of the underlying removal proceedings.