HULL, Circuit Judge:
From 2004 to 2010, Maxi Dinga Sopo resided lawfully in the United States as an asylee from Cameroon. In 2010, he pled guilty to bank fraud and became removable as an aggravated felon. After Sopo completed his criminal sentence, U.S. Immigration and Customs Enforcement (“ICE”) took custody of him. Since February 2, 2012, Sopo has been in ICE detention, pursuant to 8 U.S.C. § 1226(c), which mandates civil detention for certain criminal aliens during their removal proceedings. His removal proceedings continue before the Board of Immigration Appeals (“BIA”) today. During the past four years in ICE custody, Sopo has never had a bond hearing.
In 2013, Sopo filed a 28 U.S.C. § 2241 petition for a writ of habeas corpus, requesting a bond hearing. Sopo claimed his mandatory detention, without even a bond hearing during his protracted removal proceedings, raised serious concerns about the constitutionality of the § 1226(c) detention statute as applied to his case. The district court dismissed his petition on the basis that § 1226(c) provides that detention is mandatory for aggravated felons during the entirety of their removal proceedings.
In this appeal, we address an issue of first impression in this circuit. During their removal proceedings, are criminal aliens, like Sopo, detained under § 1226(c) entitled at any point to a bond hearing under the Due Process Clause?
All other circuits reaching this issue have concluded that the mandatory civil detention of criminal aliens under § 1226(c) is constitutional for a reasonable period of time to complete the removal proceedings, but as a matter of constitutional avoidance, at some point such detained aliens become entitled to an individualized bond hearing. The circuits are split, however, as to when this occurs.
Our analysis of this issue proceeds in nine parts. We recount Sopo’s: (1) personal background; (2) protracted removal proceedings; and (3) federal habeas case. We then discuss (4) the federal statutory framework governing the civil detention of criminal aliens and (5) Supreme Court decisions analyzing the constitutionality of immigration detention statutes, which leads us to conclude, as a matter of constitutional avoidance, that § 1226(c) contains an implicit temporal limitation against the *1203 unreasonably prolonged detention of criminal aliens without an individualized bond hearing. After reaching this holding, we (6) establish an approach for determining when the removal proceedings and the resulting § 1226(c) mandatory detention of a criminal alien become unreasonably protracted, triggering the need for a bond hearing. We also (7) settle on a mechanism the government must follow to give that detained criminal alien a bond hearing. Finally, we (8) apply our holdings to Sopo’s case and (9) conclude that he must receive an immediate bond hearing as habeas relief.
I. BACKGROUND
Sopo’s immigration case is not before us and remains pending in separate proceedings now before the BIA. Sopo has been before the immigration judge (“IJ”) and BIA three times, and his case is once again before the BIA for a fourth round of review. In this part and the next, we describe Sopo’s removal proceedings and criminal conviction, as they provide the backdrop for his mandatory detention that has lasted four years.
A. Asylum Application and Interview
Sopo is a native and citizen of Cameroon and a member of the Bali tribe. In May 2003, Sopo fled from his home country to the United States. After he arrived in the United States, Sopo applied for asylum based on his political affiliations. On August 23, 2004, the United States Citizenship and Immigration Services (“USCIS”) granted Sopo’s application for asylum.
In his application and the asylum interview, Sopo explained that he had held leadership positions in the Bali Catholic Youth Association (“BCYA”) and the Southern Cameroons National Council (“SCNC”). In 2000, Sopo was arrested during an SCNC event. The police took his clothes and starved and beat him. At least twice a day, the police hung him upside-down from a metal pole, strapped electrical nodes to his feet, and shocked him with increasing voltage.
After about a week of imprisonment, Sopo “went into shock.” The police abandoned him at a hospital, where he stayed for two weeks. Later in 2000, the police arrested Sopo’s mother, and starved, beat, and raped her in an attempt to get information about Sopo. She got out of prison by signing a pledge to give Sopo to the authorities.
In March 2002, Sopo was arrested during a BCYA meeting. The police beat him, caned him, made him drink his own urine, and told him he would never leave prison until he renounced his SCNC and BCYA activities. After about a week, Sopo became ill and was released to go to the hospital. In September 2002, the police raided Sopo’s house, arrested him again, and kept him in prison for two months. He faced more beatings during that stay.
In January 2003, Sopo obtained an American visa under his real name, but police officers at the airport refused to let him leave Cameroon because there were outstanding warrants against him. He then obtained a visa under a false name and left Cameroon in May 2003. After obtaining asylum in 2004, Sopo settled in Seattle, Washington, with his wife, who left Cameroon with him, and their daughter, who was born in the United States shortly after their arrival.
B. Criminal Charges
In March 2008, Sopo began assisting people in obtaining loans to buy used cars. Sopo planned for the loan applicants to use the cars in connection with his business. In order to obtain the loans, Sopo instructed the applicants to include false information about their employment and salary. At least four people obtained car loans at Sopo’s instruction.
*1204 While federal prosecutors were investigating the loans, Sopo traveled to Cancún, Mexico, purportedly for vacation. A warrant issued while he was there, and Mexican authorities arrested him. In April 2010, Sopo was extradited to the United States. The next month, he signed a plea agreement and pled guilty to four counts of bank fraud. In August 2010, the district court sentenced him to serve 33 months’ imprisonment and pay $147,249.92 in restitution.
Sopo served some portion of his federal sentence at a prison in Georgia. On January 17, 2012, ICE served him with a notice to appear (“NTA”), alleging that his bank-fraud convictions were aggravated felonies that made him removable under 8 U.S.C. § 1227(a) (2)(A)(iii).
II. REMOVAL PROCEEDINGS
A. Initial Hearings and December 19, 2012 IJ Decision
On February 2, 2012, ICE transferred Sopo to an immigration detention facility in Georgia. At a February 13, 2012 master calendar hearing, Sopo appeared pro se, and the IJ adjourned to give him more time to obtain legal counsel, as well as to allow the government to file an amended NTA.
At the February 27, 2012 master calendar hearing, Sopo informed the IJ that he did not receive the government’s amended NTA in time to discuss the charges with an attorney. The IJ granted him a second continuance.
At the March 14, 2012 master calendar hearing, Sopo, pro se, conceded the charge of removability. Sopo announced his intent to apply for withholding of removal and relief under the United Nations Convention Against Torture (“CAT”).[1] The IJ provided him with the necessary application forms.
During the April 16, 2012 hearing, Sopo stated that he instead wanted to resubmit his 2004 asylum application to serve as his request for withholding of removal and CAT relief. Sopo stated that he did not have a copy of the prior application because the government had not yet responded to his Freedom of Information Act (“FOIA”) request. The IJ set a deadline for Sopo to file a copy of the prior asylum application, and also ordered the parties to brief whether Sopo was eligible for a waiver under Immigration and Nationality Act (“INA”) § 209(c), 8 U.S.C. § 1159(c) (a “§ 209(c) waiver”), and adjustment of status.
At the May 16, 2012 hearing, Sopo filed an application for a § 209(c) waiver and adjustment of status. During a May 31, 2012 hearing, the government filed its response. As Sopo was still waiting on his FOIA request, the IJ adjourned the hearing.
At a June 21, 2012 hearing, Sopo was still without his FOIA documents, and the government refused to file a copy of Sopo’s previous asylum application to expedite the case. The IJ ordered Sopo to file a completed asylum application by June 28, 2012 — regardless of whether he received the FOIA documents.
At the June 28, 2012 hearing, Sopo stated that he would not file a new asylum application because the IJ did not have the authority to make him fill out a second form when the first one was in his file. Consistent with prior warnings, the IJ re *1205 sponded by deeming Sopo’s claims to withholding of removal and CAT relief abandoned, and scheduled a hearing on Sopo’s application for a § 209(c) waiver and adjustment of status.
Before the next hearing, however, the IJ recused himself and transferred the case to a new IJ. At an August 6, 2012 master calendar hearing, the new IJ continued the case until September 6, 2012, to provide Sopo with more time to receive the FOIA documents. By September 6, 2012, Sopo had received his FOIA documents, including his prior asylum application, and he filed them during the September 6 hearing.
On November 2, 2012, the IJ held a merits hearing on Sopo’s application for a § 209(c) waiver and adjustment of status, and reconvened on November 30, 2012 to further question Sopo.
On December 19, 2012, the IJ issued a written decision. The IJ indicated that, despite the previous IJ’s abandonment ruling, she had decided to consider Sopo’s 2004 asylum application as a request for withholding of removal and CAT relief. The IJ found that Sopo was a credible witness, but denied withholding of removal, CAT relief, and adjustment of status with a § 209(c) waiver, and ordered Sopo’s removal to Cameroon.
B. First Appeal to BIA and October 23, 2013 Remand
Sopo appealed to the BIA. In an October 23, 2013 opinion, the BIA noted, as a threshold matter, that the IJ had failed to terminate Sopo’s asylee status. The BIA ordered a remand and instructed the IJ to determine, in the first instance, whether Sopo’s asylee status should be terminated.
The BIA advised that, if the IJ terminated Sopo’s asylee status, the IJ would also need to re-examine CAT relief and could choose to “revisit her findings regarding whether the respondent merits a waiver under section 209 as a matter of discretion, taking into account her updated findings” on CAT relief. The BIA affirmed the denial of withholding of removal.[2]
C. Hearings on Remand and March 5, 2014 IJ Decision
At the December 5, 2013 hearing on remand, the IJ ordered briefing on whether Sopo’s asylee status should be revoked.
During a January 9, 2014 hearing, the government filed (1) the sworn statement of Nicky Church of the United Kingdom (“UK”) Border Agency of the Home Office; and (2) a motion alleging that Sopo was in the UK at points in 2000 and 2002, which contradicted key statements in Sopo’s original asylum application. In her statement, Church indicated that Sopo’s fingerprints matched the fingerprints of a Cameroonian national who was arrested in the UK at various times in 2000 and 2002.
At the January 16, 2014 hearing, Sopo submitted evidence, and the government filed a formal USCIS notice of intent to terminate Sopo’s asylee status. At the January 23, 2014 hearing, Sopo presented additional evidence. On February 10, 2014, the IJ held a merits hearing.
On March 5, 2014, the IJ issued a written decision, which terminated Sopo’s asy-lee status, denied CAT relief, and reaffirm *1206 ed the previous denial of Sopo’s application for a § 209(c) waiver and adjustment of status. The IJ found that Sopo was not a credible witness based on the Church statement and other related new evidence showing that he was not in Cameroon in 2000 and 2002. Based on the adverse credibility finding, the IJ denied Sopo’s CAT claim and declined to revisit her previous decision denying a § 209(c) waiver and adjustment of status.
D. Second Appeal to BIA and August 22, 2014 Remand
Sopo appealed the IJ’s decision to the BIA a second time. Sopo argued that the IJ failed to rule on the admissibility of the Church statement before adding it to the record and that a remand was necessary to avoid a due process violation.
On August 22, 2014, the BIA remanded Sopo’s case to the IJ. It held that the IJ properly terminated Sopo’s asylee status, but erred in relying on the Church statement to deny CAT relief. The BIA stated that Sopo should have been afforded an opportunity at his hearings to examine and object to the government’s evidence.
E. Hearings on Remand and February 25, 2015 IJ Decision
On October 8, 2014, the parties appeared on remand in a different immigration court. The presiding IJ determined that the case should be transferred back to the IJ who entered the decision that the BIA reviewed. On November 6, 2014, the parties appeared for calendaring before the proper IJ.
At a December 1, 2014 hearing, Sopo filed a motion requesting to cross-examine Church and, alternatively, contended that her signed statement was inadmissible and fraudulent. At a January 13, 2015 merits hearing, Sopo explained why the Church statement was fabricated and premised on forged documents.
On February 25, 2015, the IJ issued a written decision denying CAT relief for the third time. The IJ determined that the Church statement was admissible, but gave it little weight because the government failed to carry its evidentiary burden of showing why Church was unavailable to testify at the merits hearing. As a result, the IJ rescinded her previous determination and concluded that Sopo was credible. Nevertheless, the IJ found that Sopo had still failed to show that he was entitled to CAT relief.
F. Third Appeal to BIA and August 3, ' 2015 Affirmance
Sopo’s third appeal to the BIA argued that the IJ erred in (1) denying his CAT claim and (2) failing to reconsider the denial of his application for a § 209(c) waiver and adjustment of status, in light of the changed credibility finding.
In an August 3, 2015 order, the BIA affirmed Sopo’s order of removal. The BIA determined that: (1) Sopo had not shown that he qualified for CAT relief; and (2) the § 209(c) waiver and adjustment of status request were not properly before the BIA, as the IJ had followed the BIA’s instructions after the first remand and denied the waiver “as a matter of discretion.”
G. Petition for Review Before this Court
On August 10, 2015, in this Court, Sopo filed a petition for review and a motion for stay of removal. On September 14, 2015, over the government’s opposition, this Court granted Sopo’s motion for a stay of removal.
Partway through briefing on the petition for review, the government filed a motion to remand Sopo’s case to the BIA. The government conceded that the BIA had applied an erroneous legal standard in affirming the IJ’s denial of CAT relief, and *1207 had further erred by failing to consider whether the IJ needed to reconsider her denial of the § 209(c) waiver and adjustment of status now that she found Sopo credible again.
On February 2, 2016, this Court granted the government’s motion, vacated the BIA’s order, and remanded the case to the BIA for further proceedings on Sopo’s applications for CAT relief and a § 209(c) waiver and adjustment of status.
III. SECTION 2241 PETITION
In May 2013, against the backdrop of his ongoing administrative removal proceedings, Sopo filed a pro se § 2241 petition in the district court. Sopo alleged that he had never had a bond hearing during his then-16 months of ICE detention that began on February 2, 2012. He argued that his continued mandatory detention without a bond hearing violated the Due Process Clause. Sopo requested a bond hearing or immediate release from detention.
The government filed a motion to dismiss, claiming that Sopo’s continued detention without a bond hearing was not unlawful because § 1226(c) squarely prohibits the release of criminal aliens, like Sopo, during the entirety of the removal proceedings.
A magistrate judge issued a report and recommendation (“R&R”), recommending dismissal of the § 2241 petition. The magistrate judge concluded that § 1226(c) made Sopo’s custody mandatory, the Supreme Court upheld the statute’s constitutionality in Demore v. Kim, 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), and Sopo’s claim was meritless.
The district court overruled Sopo’s objections to the R&R, adopted the magistrate judge’s R&R, and dismissed Sopo’s § 2241 petition. Sopo filed a timely notice of appeal. On appeal, we appointed counsel for Sopo.
IY. STATUTORY FRAMEWORK
We first describe the relevant statutes in 8 U.S.C. §§ 1226 and 1231 to compare how Congress has constructed different, though noticeably interrelated, frameworks for detaining criminal and non-criminal aliens.[3]
Section 1226 authorizes the detention of aliens during the removal proceedings. While § 1226(a) controls non-criminal aliens’ detentions, § 1226(c) controls criminal aliens’ detentions. See INA § 236(a), (c), 8 U.S.C. § 1226(a), (c). Once an alien’s removal proceedings are completed, ICE’s detention authority shifts to § 1231, which also distinguishes between non-criminal and criminal aliens. See INA § 241, 8 U.S.C. § 1231.
Understanding these statutes is key to reading the two major Supreme Court cases about immigration detention and to our deciding this case.
A. Section 1226(a) and Non-Criminal Aliens During Removal Proceedings
The Attorney General has the discretion to detain a non-criminal alien “pending a decision on whether the alien is to be removed from the United States.” INA § 236(a), 8 U.S.C. § 1226(a). The Attorney General may detain the alien for the duration of the removal proceedings, or release the alien on bond or conditional parole. *1208 INA § 236(a)(1)-(2), 8 U.S.C. § 1226(a)(1)-(2). The Attorney General’s decision regarding detention, bond, or parole is not reviewable by the courts. INA § 236(e), 8 U.S.C. § 1226(e).
In connection with § 1226(a), the Department of Homeland Security (“DHS”) promulgated regulations setting out the process by which a non-criminal alien may obtain release. The regulations provide that, in order to obtain bond or conditional parole, the “alien must demonstrate to the satisfaction of the [decision maker] that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.” 8 C.F.R. § 1236.1(c)(8). The District Director makes the initial custody determination, and the alien has the right to appeal an adverse decision to the IJ, and then to the BIA. Id. § 1236.1(d)(1), (3).
B. Section 1226(c) and Criminal Aliens During Removal Proceedings
Although the Attorney General has broad discretion to release non-criminal aliens during their removal proceedings, the INA limits the Attorney General’s discretion in the case of criminal aliens. In relevant part, § 1226(c) mandates that “[t]he Attorney General shall take into custody any alien who ... is deportable by reason of having committed [an aggravated felony, among other offenses].” INA § 236(c)(1)(B), 8 U.S.C. § 1226(c)(1)(B) (emphasis added). Section 1226(c) provides that the Attorney General may release a criminal alien “only if’ necessary for narrow witness protection purposes. INA § 236(c)(2), 8 U.S.C. § 1226(c)(2).
Under § 1226(c), custody is mandatory for criminal aliens throughout the entirety of their removal proceedings, and there is no statutory possibility for release on bond.[4] In that way, subsection (c) of § 1226 serves as an exception to the flexible rule in subsection (a) of § 1226 that applies to all other aliens during removal proceedings — those that do not fall into this specific subcategory by virtue of having a qualifying criminal conviction. Compare INA § 236(a), 8 U.S.C. § 1226(a), with INA § 236(c), 8 U.S.C. § 1226(c).
Because the Supreme Court’s framework for analyzing the constitutionality of immigration detention statutes turns on subtle distinctions between the types of detention at play, we examine § 1231 to understand the broader statutory scheme.
C. Section 1231 and the 90-Day Removal Period
Section 1231 contains a 90-day window that is called the “removal period.” INA § 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A). Generally, “when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days.” Id. But this statutory 90-day “removal period” in § 1231 does not begin until the latest of three dates:
(i) The date the order of removal becomes administratively final.
(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court’s final order.
(iii) If the alien is detained or confined (except under an immigration pro *1209 cess), the date the alien is released from detention or confinement.
INA § 241(a)(1)(B), 8 U.S.C. § 1231(a)(1)(B) (emphasis added). Thus, if a court stays an alien’s removal during judicial review of the alien’s removal order, the statutory 90-day “removal period” does not begin until the court’s final order. See INA § 241(a)(1)(B)(ii), 8 U.S.C. § 1231(a)(1)(B)(ii).
During the 90-day “removal period,” the statute mandates that “the Attorney General shall detain the alien.” INA § 241(a)(2), 8 U.S.C. § 1231(a)(2) (emphasis added). “Under no circumstance during the removal period shall the Attorney General release [a criminal alien].” Id. If a criminal alien is already detained under § 1226(c) during removal proceedings, detention pursuant to § 1231 does not begin until the date the “removal period” begins, which is the latest of the three dates outlined above.
Notably, if the Attorney General is unable to remove an alien within the 90-day removal period, § 1231 differentiates between non-criminal and criminal aliens. Compare INA § 241(a)(3), 8 U.S.C. § 1231(a)(3), with INA § 241(a)(6), 8 U.S.C. § 1231(a)(6). If a non-criminal alien is not removed during the 90-day removal period, the Attorney General must release the non-criminal alien “subject to supervision.” INA § 241(a)(3), 8 U.S.C. § 1231(a)(3).[5]
However, if the Attorney General is unable to remove a criminal alien within the 90-day removal period, she may continue detaining the criminal alien as a matter of discretion. See INA § 241(a)(6), 8 U.S.C. § 1231(a)(6). Section 1231(a)(6) provides that criminal aliens “may be detained beyond the removal period and, if released, shall be subject to the terms of supervision” governing noncriminal aliens not removed during the 90-day period. Id. Therefore, on the face of the statute, the Attorney General may detain a criminal alien indefinitely without providing an opportunity for supervised release. See id
In sum, the statutory framework in § 1226 and § 1231 grants the Attorney General broad discretion to release noncriminal aliens both during removal proceedings and even after a final removal order. In stark contrast, Congress has mandated the detention of criminal aliens throughout the entire process. We now review the Supreme Court decisions addressing the constitutionality of Congress’s mandates in these statutes.
V. DISCUSSION
A. Supreme Court Decisions
In Zadvydas v. Davis, 533 U.S. 678, 688-89, 121 S.Ct. 2491, 2498, 150 L.Ed.2d 653 (2001), the Supreme Court addressed § 1231(a)(6), which authorizes the Attorney General to detain criminal aliens after the expiration of the 90-day removal period. The Supreme Court applied the doctrine of constitutional avoidance and construed the statute to contain an implicit temporal limitation on the Attorney General’s detention of criminal aliens. Zadvydas, 533 U.S. at 682, 689, 121 S.Ct. at 2495, 2498.
This case arose after the government failed to remove petitioner Zadvydas, a criminal alien, during that 90-day removal window. Id. at 684, 121 S.Ct. at 2496. Zadvydas was born to Lithuanian parents in a displaced persons camp in Germany, and neither Germany nor Lithuania regarded him as a citizen. Id. at 684, 121 S.Ct. at 2495-96. Both countries refused to *1210 accept him from the United States, and his removal in the foreseeable future was unlikely. See id. at 684, 699, 121 S.Ct. at 2496, 2504.
The government maintained that § 1231(a)(6) allowed the Attorney General to detain Zadvydas, and similarly situated criminal aliens, indefinitely, but the Supreme Court held otherwise. See id. at 682, 689, 121 S.Ct. at 2495, 2498. The Supreme Court began by emphasizing that “[f]reedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty [the Due Process] Clause protects.” Id. at 690, 121 S.Ct. at 2498. It also clarified that “the Due Process Clause applies to all ‘persons’ within the United States, including aliens.” Id. at 693, 121 S.Ct. at 2500.
The Supreme Court stated that immigration proceedings and detention “are civil, not criminal, and ... nonpunitive in purpose and effect.” See id. at 690, 121 S.Ct., at 2499. Under the Due Process Clause, civil detention is permissible only when there is a “special justification” that “outweighs the individual’s constitutionally protected interest in avoiding physical restraint.” Id. (quotation marks omitted). The Supreme Court could discern no special justification for indefinitely holding criminal aliens in civil detention who were not especially dangerous, and who had little chance of actually being removed. Id. at 690-91, 121 S.Ct. at 2499.
The Supreme Court reiterated the rule that “[i]t is a cardinal principle of statutory interpretation ... that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.”[6] Id. at 689, 121 S.Ct. at 2498 (quotation marks omitted). As “[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem” under the Fifth Amendment’s Due Process Clause, the Supreme Court determined that Congress must have included an implicit temporal limitation in § 1231(a)(6). Id. at 682, 690, 699, 121 S.Ct. at 2495, 2498, 2503. That limitation, in turn, allowed for habeas relief after the criminal alien’s detention exceeded the “period reasonably necessary to secure removal.” Id. at 682, 699, 121 S.Ct. at 2495, 2504.
The Supreme Court further instructed that the reasonableness of the length of a criminal alien’s detention should be measured “primarily in terms of the statute’s basic purpose.” Id. at 699, 121 S.Ct. at 2504. It provided a bright-line rule for administrative ease, and held that, after six months in post-removal-order status, if the criminal alien provides “good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.” Id. at 701, 121 S.Ct. at 2505. If the government does not meet its burden, the criminal alien must be released from confinement. See id.
Two years after Zadvydas, the Supreme Court took up Demore, which examined the mandatory detention statute at issue here — § 1226(c), which authorizes detention of criminal aliens during the entirety of the removal proceedings. Demore, 538 U.S. at 513, 123 S.Ct. at 1712. The Supreme Court distinguished the “potentially permanent” detention period at issue in Zadvydas from detention during the pen-dency of removal proceedings, and upheld *1211 § 1226(c) as facially constitutional. Id. at 528-29, 531, 123 S.Ct. at 1720-22 (quotation marks omitted). The Supreme Court based its holding on two factors.
First, the Supreme Court emphasized that the purpose of the mandatory detention in § 1226(c) is to prevent deportable criminal aliens from absconding and from committing more crimes before they are removed. See id. at 518-20, 527-28, 123 S.Ct. at 1714-15, 1719-20. The Supreme Court explained that “Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens.” Id. at 518, 123 S.Ct. at 1714. The evidence before Congress showed that 77 percent of removable criminal aliens were arrested at least once after their original offense and before their removal, and 45 percent were arrested multiple times. Id. at 518, 123 S.Ct. at 1715. On top of that, approximately 20 percent did not appear for their removal proceedings. Id. at 519, 123 S.Ct. at 1715.
As the Immigration and Naturalization Service (“INS”) was unable to identify, much less remove, criminal aliens, Congress provided for mandatory detention. Id. at 518, 521, 123 S.Ct. at 1715-16. The Supreme Court observed that, unlike the detention of the petitioner in Zadvydas (where it was impossible to effectuate § 1231(a)(6)’s goal of removing the criminal alien), the continued detention of petitioner Demore under § 1226(c) still served Congress’s purposes, because it ensured that he would come to his removal proceedings instead of remaining at large where he could commit more crimes. See id. at 518, 527-28, 123 S.Ct. at 1715, 1719-20.
Second, the Supreme Court stressed the length of the detention in distinguishing between § 1226(c)’s constitutionality and § 1231(a)(6)’s unconstitutionality. It noted that there were statistics showing that, in the majority of cases, a criminal alien’s removal proceedings lasted less than 90 days. Id. at 529, 123 S.Ct. at 1720. In 85 percent of cases in which the government held the alien under § 1226(c), “removal proceedings [were] completed in an average time of 47 days and a median of 30 days. In the remaining 15 [percent] of cases, in which the alien appealed] the decision of the Immigration Judge ... appeal [took] an average of four months, with a median time that [was] slightly shorter.” Id. at 529, 123 S.Ct. at 1721 (citation omitted).
The Supreme Court concluded: “In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal.” Id. at 530, 123 S.Ct. at 1721. It found that this was a limited period of time and materially different from the indefinite detention discussed in Zadvydas. See id. at 528, 123 S.Ct. at 1720.
Based on these critical observations, the Supreme Court held that “Congress ... may require that persons ... be detained for the brief period necessary for their removal proceedings,” without the opportunity to argue for bond.[7] See id. at 513, 123 S.Ct. at 1712 (emphasis added).
*1212 Justice Kennedy provided the fifth vote for the majority opinion, but wrote a concurrence, which is “especially relevant” to our reading of Demore. See Pesci v. Budz, 730 F.3d 1291, 1297 n.2 (11th Cir. 2013). Justice Kennedy suggested that, though the mandatory detention of criminal aliens under § 1226(c) was facially constitutional, there was still room for as-applied challenges in unique circumstances. See Demore, 538 U.S. at 532-33, 123 S.Ct. at 1722 (Kennedy, J., concurring). His analysis was that, “since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified.” Id. at 532, 123 S.Ct. at 1722 (Kennedy, J., concurring) (emphasis added). He added that, “[wjere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.” Id. at 532-33, 123 S.Ct. at 1722 (Kennedy, J., concurring) (emphasis added).
While Demore upheld § 1226(c)’s provision mandating detention of criminal aliens during removal proceedings, it did so with a strong constitutional caveat about due process concerns as to continued mandatory detention where the duration of the removal proceedings is unreasonably long or delayed. Outside of Justice Kennedy’s Demore concurrence, the Supreme Court has never addressed how long under § 1226(c) the government can detain a criminal alien, here an aggravated felon.
B. Implicit Temporal Limitation in § 1226(c)
Because Demore upheld the constitutionality of § 1226(c), the government takes the position that § 1226(c) mandates the detention of criminal aliens during their entire removal proceedings, no matter how long they last. The government ignores that this is a civil detention case and the profound liberty interest at stake. “Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects.” Zadvydas, 533 U.S. at 690, 121 S.Ct. at 2498.
Reading Demore and Zadvydas together, and as a matter of constitutional avoidance, five other circuits have rejected the government’s position and construed § 1226(c) to contain an implicit temporal limitation and to authorize criminal aliens’ detention, not indefinitely, but for a reasonable amount of time after which a bond hearing is necessary to fulfill the purposes of the mandatory detention statute. See Reid v. Donelan, 819 F.3d 486, 494 (1st Cir. 2016) (stressing the concept that “a categorical, mandatory, and indeterminate detention raises severe constitutional concerns” in recognizing “that the Due Process Clause imposes some form of ‘reasonableness’ limitation upon the duration of detention that can be considered justifiable under that statute,” and finding “it necessary to read an implicit reasonableness requirement into the statute”); Lora v. Shanahan, 804 F.3d 601, 606 (2d Cir. 2015) (“[W]e hold that, in order to avoid significant constitutional concerns surrounding the application of section 1226(c), it must be read to contain an implicit temporal limitation.”), petition for cert. filed, 84 U.S.L.W. 3562 (U.S. Apr. 21, 2016) (No. 15-1307); Rodriguez v. Robbins, 715 F.3d 1127, 1138 (9th Cir. 2013) (“[W]e conclude that, to avoid constitutional concerns, § 1226(c)’s mandatory language must be construed to contain an implicit reasonable time limitation.... ” (quotation marks omitted)); Diop v. ICE/Homeland Sec., *1213 656 F.3d 221, 231-32 (3d Cir. 2011) (“[W]e conclude that the statute implicitly authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute’s purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community.”); Ly v. Hansen, 351 F.3d 263, 267-68, 270-71 (6th Cir. 2003) (“Therefore, we hold that the INS may detain prima facie removable aliens for a time reasonably required to complete removal proceedings in a timely manner. If the process takes an unreasonably long time, the detainee may seek relief in habeas proceedings.”).
In so holding, these circuits have acknowledged the realities of immigration detention and how the entire process of removal proceedings has lengthened. Prior to Demore, in 2001, the average time that an alien was detained while awaiting a final order of removal or release, under any statutory detention provision, was 39 days. Lora, 804 F.3d at 605. By 2003, the year of Demore, criminal aliens specifically were spending an average of 47 days in detention. See id. While the government has not provided statistics in recent years, academic researchers estimate that in 2012 the average amount of time an alien with a criminal conviction spent in removal proceedings (and likely in detention) was 455 days. See Mark Noferi, Cascading Constitutional Deprivation: The Right to Appointed Counsel for Mandatorily Detained Immigrants Pending Removal Proceedings, 18 Mich. J. Race & L. 63, 81 (2012) (relying on data from Syracuse University’s Transactional Records Access Clearinghouse). This represents a dramatic increase since the Supreme Court decided Demore a decade earlier and since Congress enacted § 1226(c) in 1996. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-585 to -87; Demore, 538 U.S. 510, 123 S.Ct. 1708.
These other circuits have concluded that Congress constitutionally can require mandatory detention during a criminal alien’s removal proceedings as a general rule, but § 1226(c) may become unconstitutionally applied if a criminal alien’s detention without even a bond hearing is unreasonably prolonged. In other words, § 1226(c) must contain an “implicit reasonable time limitation, the application of which is subject to federal court review.” Cf. Zadvydas, 533 U.S. at 682, 121 S.Ct. at 2495 (quotation marks omitted). Construing the statute in this fashion avoids “serious doubt[s]” about the constitutionality of indefinite detention. See id. at 689, 121 S.Ct. at 2498. Other circuits have also concluded that this construction is “fairly possible” because Congress has not clearly demonstrated an intent to empower the Attorney General to indefinitely detain criminal aliens. See id. at 689, 121 S.Ct. at 2498; see, e.g., Diop, 656 F.3d at 235 (stating that a court cannot interpret a statute to avoid constitutional concerns when doing so would be inconsistent with clear congressional intent, but concluding that there was no issue in this context because there was no evidence that Congress intended to indefinitely detain aliens under § 1226(c)); cf. Reid, 819 F.3d at 494 (“[Cjourts interpret statutes with the presumption that Congress does not intend to pass unconstitutional laws.” (alteration in original) (quotation marks omitted)).
Sopo’s case illustrates how protracted some removal proceedings have become in recent years due, in part, to the complexity of immigration issues. ICE’s continuous mandatory detention of Sopo without a bond hearing has lasted for four years, including through two BIA remands to the IJ, and patently raises serious constitutional concerns. Therefore, as a mat *1214 ter of constitutional avoidance, we readily join other circuits in holding that § 1226(c) “implicitly authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute’s purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community.” Diop, 656 F.3d at 231. We too construe § 1226(c) to contain an implicit temporal limitation at which point the government must provide an individualized bond hearing to detained criminal aliens whose removal proceedings have become unreasonably prolonged. See Demore, 538 U.S. at 532, 123 S.Ct. at 1722 (Kennedy, J., concurring).
We now turn to the more challenging issue of discerning the trigger point at which a detained criminal alien’s removal proceedings and concomitant mandatory detention become unreasonably prolonged, triggering the need for an individualized bond hearing.
VI. TRIGGER POINT
A. Approaches of Other Circuits
Courts throughout the country have adopted one of two general approaches for evaluating when a criminal alien’s due process rights are violated by mandatory civil detention without a bond hearing under § 1226(c). We refer to these as the “bright-line” and “case-by-case” approaches.
The Second and Ninth Circuits use the bright-line approach. The Ninth Circuit requires that, at the six-month mark, the government shall provide all criminal aliens detained under § 1226(c) "with a bond hearing. See Rodriguez v. Robbins, 804 F.3d 1060, 1065, 1079-81 (9th Cir. 2015), petition for cert. filed sub, nom., Jennings v. Rodriguez, 84 U.S.L.W. 3562 (U.S. Mar. 25, 2016) (No. 15-1204). The Second Circuit also adopted the six-month rule, reasoning that it eliminates “inconsistency and confusion” and ensures that “similarly situated detainees receive similar treatment.” Lora, 804 F.3d at 614-16.
At the bond hearing stage, the Ninth Circuit requires the government to “prove by clear and convincing evidence that [a criminal] alien is a flight risk or a danger to the community to justify denial of bond.” Rodriguez, 804 F.3d at 1087 (quotation marks omitted). The Second Circuit requires the government, at the bond hearing before an IJ, to carry the burden of proof to establish by clear and convincing evidence that the criminal alien is a flight risk or a danger to the community. Lora, 804 F.3d at 616.
For the ease-by-case approach, we look to the First, Third, and Sixth Circuits, which have rejected a bright-line rule and held that whether detention of a criminal alien has become unreasonable depends on the factual circumstances of the case. Those courts have held that, because each criminal alien’s removal proceedings raises a unique set of facts and issues, making the length of the proceedings unpredictable, it would be unwise to set a universal or bright-line timeline for when mandatory detention shifts from being reasonable to unreasonable. See Reid, 819 F.3d at 496 (rejecting a bright-line six-month rule on multiple grounds, including the fact that the Zadvydas six-month period “was predicated on there being no foreseeable hope of removal,” the detention was “potentially permanent,” and “there were simply no metrics by which to judge just how much longer towards eternity could be considered ‘reasonable,’ ” warranting a bright-line rule (quotation marks omitted)); Diop, 656 F.3d at 232-33 (noting that the inquiry into whether detention has become unreasonable “will necessarily be a fact-dependent inquiry that will vary depending on *1215 individual circumstances” and “declining] to establish a universal point at which detention will always be considered unreasonable”); Ly, 351 F.3d at 271 (“A bright-line time limitation ... would not be appropriate .... [C]ourts must examine the facts of each case[ ] to determine whether there has been unreasonable delay in concluding removal proceedings.”).
These three circuit courts instruct that a criminal alien may file a § 2241 petition when he contends that his removal proceedings and continued civil detention without a bond hearing have become protracted and thus violate the Due Process Clause. See Reid, 819 F.3d at 498-99; Diop, 656 F.3d at 233, 235; Ly, 351 F.3d at 272-73. Then, a federal court, examining the individual circumstances of the case, will decide whether the criminal alien’s continued detention has become unreasonable. See Reid, 819 F.3d at 500-01; Diop, 656 F.3d at 234; Ly, 351 F.3d at 272-73.
Under this configuration, if the district court grants the criminal alien’s § 2241 petition, it then orders the government to provide an opportunity for the alien to obtain bond. At that point, the Third Circuit shifts the burden of proof from the petitioner to the government. See Diop, 656 F.3d at 233. The Third Circuit ruled that there must be a bond hearing “at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute.” Id. The Sixth Circuit has not explicitly defined the mechanism by which the government must make an individualized bond determination; but, in Ly, it affirmed a district court order that directed the agency to hold a hearing. 351 F.3d at 266, 273. The First Circuit also affirmed a district court order directing the government to hold a bond hearing. Reid, 819 F.3d at 491-92.
The First Circuit’s Reid decision contains the most extensive discussion of why an individualized case-by-case approach adheres more closely to the relevant legal precedent. The First Circuit reasoned that, “while the Second and Ninth Circuits claim to have read an implicit ‘reasonableness limitation’ into § 1226(c), we think it more accurate to say that they have simply read an implicit ‘six-month expiration’ into § 1226(c).” Id. at 497. The First Circuit viewed “Demore as implicitly foreclosing our ability to adopt a firm six-month rule” because “[i]n Demore, the Supreme Court declined to state any specific time limit in a case involving a detainee who had already been held for approximately six months.” Id. In addition, “[t]he Demore Court also briefly discussed facts specific to the detainee, such as his request for a continuance of his removal hearing.” Id. (citing Demore, 538 U.S. at 530-31 & n.15, 123 S.Ct. at 1721 & n.15).
The First Circuit concluded that, “[t]aken together, Zadvydas, Demore, and the inherent nature of the ‘reasonableness’ inquiry weigh heavily against adopting a six-month presumption of unreasonableness.” Id. It added that the practical advantages of the bright-line approach are “persuasive justifications for legislative or administrative intervention, not judicial decree.” Id. at 498.
B. Adoption of the Case-by-Case Approach
We join the First, Third, and Sixth Circuits and adopt the case-by-case approach. To begin with, “[r]easonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case.” Diop, 656 F.3d at 234. A bright-line approach strips away the essence of a reasonableness standard.
For example, Justice Kennedy’s concurrence in Demore examined the factual specifics of the case at hand. It did not at *1216 tempt to impose a one-size-fits-all solution. His concurrence indicated that there may be situations in which the government delays the removal proceedings and then continues to detain the alien for non-statutory purposes. See Demore, 538 U.S. at 532-33, 123 S.Ct. at 1722 (Kennedy, J., concurring). Turning to the facts of petitioner Demore’s case, his concurrence concluded that a court could not draw such an inference “from the circumstances of that case.” See id. at 533, 123 S.Ct. at 1726 (Kennedy, J., concurring).
Further, § 1226(c) does not come ready-made with a time cutoff the way § 1231 does, suggesting that a case-by-case approach is more appropriate in this context. Specifically, the § 1231 statute in Zadvydas already had a 90-day limitation, to which the Supreme Court appended another 90 days, creating a 6-month cutoff. In contrast, the § 1226(c) statute contains no time limitation at all on which to base a firm cutoff.
In opposing a bright-line rule, the government also points out that, were we to impose a strict cutoff, a criminal alien could deliberately cause months of delays in the removal proceedings to obtain a bond hearing and then abscond and avoid removal altogether. Aliens in post-removal-period detention, on the other hand, do not have the opportunity to engage in such gamesmanship.
In addition, the complex course of events during removal proceedings is markedly different from the limited nature of what must happen in the 90-day removal period. To implement the last discrete step of removal to another country, the government follows roughly the same process for each alien. It gathers travel documents and arranges for transportation. The government controls that removal process. The detained alien cannot go back home or anywhere without the government doing its job. The § 1231 statute gave the government 90 days, and the Supreme Court gave it 90 more, for a 6-month limit to accomplish this discrete task.
But even then, as the First Circuit emphasized, the Supreme Court in Zadvydas did not actually adopt a six-month cutoff. As to this point, the First Circuit explained:
The [Supreme] Court pointed out that not every alien to be removed would be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future. If six months had passed and the alien had demonstrated no significant likelihood of removal in the reasonably foreseeable future, then the government was required to respond with evidence sufficient to rebut that showing. If the government could demonstrate a reasonably foreseeable termination point, the detention continued.
Reid, 819 F.3d at 496 (citations omitted) (quotation marks omitted).
In contrast to the 90-day removal period, removal proceedings involve many more exigencies and the conduct of the criminal alien can equally affect the duration of that alien’s removal proceedings. Even though criminal aliens have aggravated felonies making them promptly removable, criminal aliens may apply for different forms of purely discretionary relief. Some ask for multiple continuances, some choose to file frivolous appeals while others do not, and each IJ has a docket with different demands. There is little consistency in the pace of immigration proceedings from case to case. This difference necessitates a different approach to detention of criminal aliens during removal proceedings — one flexible enough to account for the circumstances of each case.
*1217 Critics of the case-by-case approach claim that the standard is too difficult for the federal courts to administer and creates inconsistencies in § 2241 proceedings. But federal courts have the institutional competence to make fact-specific determinations, and they have great experience applying reasonableness standards.[8] We agree with the First Circuit that the reasonableness standard adheres more closely to legal precedent, and the practical advantages of the bright-line approach are “persuasive justifications for legislative or administrative intervention, not judicial decree.” Id. at 498.
This brings us to the, nature of the reasonableness inquiry itself.
C. Reasonableness Factors for the District Courts to Consider in § 2241 Cases
As instructed by Zadvydas and Demore, we begin with the core principle that “the reasonableness of any given detention pursuant to § 1226(c) is a function of whether it is necessary to fulfill the purpose of the statute.” Diop, 656 F.3d at 234. Several factors should guide a district court in determining whether a particular criminal alien’s continued detention, as required by § 1226(c), is necessary to fulfilling Congress’s aims of removing criminal aliens while preventing flight and recidivism.
First, one critical factor is the amount of time that the criminal alien has been in detention without a bond hearing. Given that Congress and the Supreme Court believed that most removal proceedings would be completed within five months, and the Supreme Court provided for a six-month rule in Zadvydas, “the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past those thresholds.” See id. (emphasis added). Accordingly, there is little chance that a criminal alien’s detention is unreasonable until at least the six-month mark.
Looking to the outer limit of reasonableness, we suggest that a criminal alien’s detention without a bond hearing may often become unreasonable by the one-year mark, depending on the facts of the case. See Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 478 (3d Cir. 2015) (“[Bjeginning sometime after the six-month timeframe considered by Demore, and certainly by the time [the alien] had been detained for one year, the burdens to [the alien’s] liberties outweighed any justification for ... detaining] him without bond to further the goals of the statute.”). The need for a bond inquiry is likely to arise in the six-month to one-year window, at which time a court must determine whether the purposes of the statute — preventing flight and criminal acts — are being fulfilled, and whether the government is incarcerating the alien for reasons other than risk of flight or dangerousness. See Demore, 538 U.S. at 532-33, 123 S.Ct. at 1722 (Kennedy, J., concur *1218 ring). The government is not required to free automatically a criminal alien who obtains a bond hearing; but the government must at least afford the alien an individualized bond inquiry.
A second factor in the reasonableness evaluation is why the removal proceedings have become protracted. Courts should consider whether the government or the criminal alien have failed to participate actively in the removal proceedings or sought continuances and filing extensions that delayed the case’s progress. See id. at 532, 123 S.Ct. at 1722 (Kennedy, J., concurring); Diop, 656 F.3d at 234; Ly, 351 F.3d at 272. Errors by the immigration court or the BIA that cause unnecessary delay are also relevant. See Leslie v. Att’y Gen, of the U.S., 678 F.3d 265, 269 (3d Cir. 2012); Diop, 656 F.3d at 234; Ly, 351 F.3d at 272; cf. Demore, 538 U.S. at 532, 123 S.Ct. at 1722 (Kennedy, J., concurring).
We are not saying that aliens should be punished for pursuing avenues of relief and appeals. See Ly, 351 F.3d at 272 (“[A]ppeals and petitions for relief are to be expected as a natural part of the process. An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him.”). However, the district court may examine the record to determine whether the alien sought repeated or unnecessary continuances, or filed frivolous claims and appeals. See Diop, 656 F.3d at 234 (“[T]he reasonableness determination must take into account a given individual detainee’s need for more or less time.... ”). Evidence that the alien acted in bad faith or sought to deliberately slow the proceedings in hopes of obtaining release cuts against the alien. See Chavez-Alvarez, 783 F.3d at 476; Ly, 351 F.3d at 272.
Courts conducting this reasonableness analysis have considered three more factors, including: (3) whether it will be possible to remove the criminal alien after there is a final order of removal; (4) whether the alien’s civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable; and (5) whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention. See Chavez-Alvarez, 783 F.3d at 478; Ly, 351 F.3d at 271. The government has ready access to this type of information.
Similarly, the First Circuit has listed these as factors a court might examine, inter alia: “the total length of the detention; the foreseeability of proceedings concluding in the near future (or the likely duration of future detention); the period of the detention compared to the criminal sentence; the promptness (or delay) of the immigration authorities or the detainee; and the likelihood that the proceedings will culminate in a final removal order.” Reid, 819 F.3d at 500. We agree with the First Circuit that “[t]here may be other factors that bear on the reasonableness of categorical detention, but we need not strain to develop an exhaustive taxonomy here. We note these factors only to help resolve the case before us and to provide guideposts for other courts conducting such a reasonableness review.” Id. at 501.
Our list of factors is not exhaustive. The reasonableness inquiry is necessarily fact intensive, and the factors that should be considered will vary depending on the individual circumstances present in each case. See Diop, 656 F.3d at 232-33 (“At a certain point, continued detention becomes unreasonable .... This will necessarily be a fact-dependent inquiry that will vary depending on individual circumstances.”).
In sum, § 2241 courts must consult the record and balance the government’s interest in continued detention *1219 against the criminal alien’s liberty interest, always seeking to determine whether the alien’s liberty interest has begun to outweigh “any justification for using presumptions to detain him without bond.” See Chavez-Alvarez, 783 F.3d at 478. If the balance tips in the alien’s favor, the district court must grant the § 2241 habeas petition and order the government to afford the criminal alien an individualized bond inquiry.
VII. BOND REGULATIONS
When detained criminal aliens become entitled to a bond hearing, the agency shall conduct a bond inquiry under the procedures outlined in 8 C.F.R. § 1286.1(c)(8) and (d). These are the existing regulations governing bond proceedings for non-criminal aliens detained under § 1226(a). We see three primary reasons for using the existing regulations that govern non-criminal aliens.
First, as we indicate above, subsection (c) of § 1226 is an exception to subsection (a). Generally, the Attorney General has the discretion to release aliens in removal proceedings on either bond or conditional parole. INA § 236(a)(2), 8 U.S.C. § 1226(a)(2). Congress, however, circumscribed the Attorney General’s discretion for that subset of aliens in removal proceedings who have committed certain criminal offenses. INA § 236(c), 8 U.S.C. § 1226(c). It therefore makes sense that, once the government can no longer eonsti-tutionally detain a criminal alien under subsection (c) without a bond hearing, the criminal alien’s detention defaults to subsection (a) that governs the detention of non-criminal aliens. And subsection (a) carries with it regulations governing bond.[9]
Second, our reluctance to formulate from scratch the bond procedures to be used, and our decision to instead defer to the agency’s preexisting regulations, comports with basic principles of administrative law. Courts afford agencies considerable deference in their policy realms and do not rewrite or create regulations for them to follow. See Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth., 464 U.S. 89, 98 n.8, 104 S.Ct. 439, 444 n.8, 78 L.Ed.2d 195 (1983) (“[A]n agency acting within its authority to make policy choices consistent with -the congressional mandate should receive considerable deference from courts.... ”); Defs. of Wildlife v. U.S. Dep’t of the Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (“The court’s role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for 'the administrative agency’s decision.” (quotation marks omitted)). DHS has already determined how to fairly and efficiently administer bond hearings, and we do not disturb its reasoned judgment.[10]
Third, while Sopo asks us to shift the burden of proof to the government, that *1220 would give criminal aliens a benefit that non-criminal aliens do not have. See Reid v. Donelan, 22 F.Supp.3d 84, 92-93 (D. Mass. 2014) (explaining why the bond regulations that apply to non-criminal aliens should apply to criminal aliens once they become entitled to a bond hearing), aff'd in part and vacated in part, 819 F.3d 486 (1st Cir. 2016).[11] We recognize that, by the time a criminal alien becomes eligible for a bond hearing, he has already experienced a lengthy detention. That detention, however, occurs because Congress enacted the mandatory detention statute in § 1226(c), a statutory approach that comparatively disadvantages aliens who commit crimes over law-abiding aliens in removal proceedings.
Accordingly, the agency shall follow 8 C.F.R. § 1236.1(c) to afford the detainee alien with an opportunity to obtain bond from the District Director, and if necessary, to appeal to the IJ and then to the BIA under the provisions outlined in § 1236.1(d). See 8 C.F.R. § 1236.1(c), (d). Like non-criminal aliens, the criminal alien carries the burden of proof and must show that he is not a flight risk or danger to others. Id. § 1236.1(c)(8).
The IJs and the BIA already have experience applying these regulations and have standards to guide them in implementing the regulations. See, e.g., In re Guerra, 24 I. & N. Dec. 37, 40 (BIA 2006) (announcing nine factors for IJs to evaluate when determining if an alien poses a danger or is likely to abscond). We are confident that criminal aliens will have an adequate opportunity to obtain release under the existing regulations that apply to non-criminal aliens.
Having settled on the reasonableness standard and the logistics of bond, we turn back to Sopo and his § 2241 petition.
VIII. SOPO’S DETENTION
Application of the above reasonableness factors to Sopo’s case is straightforward. As to the first factor, Sopo has been in continuous detention for four years without a bond hearing, at least three-and-a-half of which have been under § 1226(c) detention.[12] The sheer length of Sopo’s detention on its own is enough to convince us that his liberty interest long ago outweighed any justifications for using presumptions to detain him without a bond inquiry. See Chavez-Alvarez, 783 F.3d at 478.
As to the second factor — cause of delay — the government did not respond to Sopo’s FOIA request for months. The *1221 prosecutor refused to file a copy of Sopo’s 2004 asylum application. The bulk of the government’s delay, though, came from the IJ erring several times. Indeed, Sopo’s proceedings continue to this day.
While Sopo refused to file a new asylum application form in 2012, insisted on retrieval of his 2004 form, and requested continuances, the delays he caused were negligible compared to the amount of time it took for his case to move back and forth between the IJ and the BIA three times. Importantly too, Sopo's civil immigration detention is in a prisondike facility and is now longer than his prison time for bank fraud.
“[T]here can be no question that [Sopo’s] detention ... without further inquiry into whether it was necessary to ensure his appearance at the removal proceedings or to prevent a risk of danger to the community, [is] unreasonable and, therefore, a violation of the Due Process Clause.” Diop, 656 F.3d at 234-35. Accordingly, we order the government to grant Sopo an individualized bond inquiry within ten days of the filing date of this opinion.
IX. CONCLUSION
In conclusion, we vacate the district court’s order denying Sopo’s § 2241 petition and remand for an entry of judgment in Sopo’s favor, consistent with this opinion.
VACATED AND REMANDED WITH INSTRUCTIONS.

. When we use the term “CAT relief,’’ we are referring to deferral of removal under the CAT. When we use the term "withholding of removal,’’ we are referring to withholding of removal under the INA. We choose these terms to avoid unnecessarily complicating our discussion of Sopo’s immigration proceedings, when his § 2241 petition is the subject of this opinion.

. Typically, when an alien cannot establish grounds for withholding of removal under the INA, the alien cannot obtain any form of CAT relief, as proving torture under the CAT is harder than proving persecution under the INA. Sopo, however, was barred from obtaining withholding of removal — under the INA and the CAT — due to the nature of his crimes. But he remained eligible for deferral of removal under the CAT. This seems tó explain how the BIA, in Sopo's case, affirmed the denial of withholding of removal, while deciding that the CAT claim required further merits review.

. When we use the term "criminal aliens,” we refer to the subset of aliens who have committed serious enough crimes to fall under the provisions of § 1226(c). This includes crimes of moral turpitude, controlled substance offenses, aggravated felonies, certain firearm offenses, human trafficking, and crimes relating to national security and terrorism. See INA § 236(c)(1); 8 U.S.C. § 1226(c)(1). When we use the term “non-criminal aliens,” we refer to all aliens who have not committed any of these § 1226(c) predicate offenses.

. The only process to which a criminal alien is entitled is a "Joseph hearing,” during which the alien has the opportunity to prove that he is not subject to § 1226(c). Demore, 538 U.S. at 514 n.3, 123 S.Ct. at 1712 n.3; see In re Joseph, 22 I. & N. Dec. 799 (1999). The detainee may avoid mandatory detention if he establishes that he is not an alien, that he was not convicted of a predicate crime, or “that the INS is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention.” Demore, 538 U.S. at 514 n.3, 123 S.Ct. at 1712 n.3.

. While under supervision, the alien must periodically appear before an immigration officer, obey written restrictions, and comply with other requirements provided for by regulation. INA § 241(a)(3), 8 U.S.C. § 1231(a)(3).

. The Supreme Court explained that the doctrine of constitutional avoidance reflects the basic assumption that Congress intends to legislate within constitutional limits. Almen-darez-Torres v. United States, 523 U.S. 224, 238, 118 S.Ct. 1219, 1228, 140 L.Ed.2d 350 (1998).

. The Supreme Court in Demore emphasized that Congress has broad power to legislate on immigration. Demore, 538 U.S. at 521, 123 S.Ct. at 1716 ("In the exercise of its broad power over naturalization and immigration. ...” (quotation marks omitted)). However, that power is limited by the Due Process Clause. See id. at 523, 123 S.Ct. at 1717. The Supreme Court reasoned that these principles operate together to allow Congress to initially require the detention of criminal aliens without a specific, individualized finding that a particular alien is a danger to the community or a flight risk. See id. at 523-30, 123 S.Ct. at 1717-22.

. The constitutional principles at play here, of course, apply to the government’s conduct — detaining criminal aliens — whether a § 2241 petition is filed or only potentially forthcoming. The government is constitutionally obligated to follow the law, and the law under § 1226(c) now includes a temporal limitation against the unreasonably prolonged detention of a criminal alien without a bond hearing. The government does not need to wait for a § 2241 petition to be filed before affording an alien an opportunity to obtain bond. The government is already responsible for implementing the bond mechanism regulations for non-criminal aliens and is equipped to do the same in this context, at the point when the criminal alien’s continuous mandatory detention becomes unreasonably protracted. As explained infra, the criminal alien also can appeal the District Director's initial bond determination to the IJ and BIA.

. This is how detention beyond the 90-day removal period operates for criminal aliens who cannot be removed to another country. If the Attorney General chooses to release a criminal alien on terms of supervision, the alien’s supervision is governed by the statute and regulations controlling non-criminal aliens’ supervision. See INA § 241(a)(6), 8 U.S.C. § 1231(a)(6), cross-referencing INA § 241(a)(3), 8 U.S.C. § 1231(a)(3). We regard this as further evidence that the statutes relating to non-criminal aliens provide the general rules for detention, and the statutes governing criminal aliens represent exceptions.

. There has been no separate constitutional challenge in this case to the bond regulations set forth in 8 C.F.R. § 1236.1(c)(8) and (d) that apply to non-criminal aliens. This decision now affords criminal aliens subject to mandatory detention the benefit of these regulations when the criminal alien's statutorily mandated detention under § 1226(c) becomes unreasonably prolonged, triggering the need for an individualized bond hearing.

. Although it reversed the district court’s ruling as to the class claim, the First Circuit summarily affirmed the district court's ruling that Reid was entitled to a bond hearing under the regulations effectuating § 1226(a). See Reid, 819 F.3d at 491, 501-02. The First Circuit also noted that, after Reid received a bond hearing, the government granted him bond. See id. at 501.

. The government asserts that Sopo's detention shifted from § 1226(c) to § 1231 when the BIA issued an administratively final removal order on August 10, 2015, citing mainly a footnote in Akinwale v. Ashcroft, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002). Sopo responds that he has remained in § 1226(c) detention the whole time he has been in custody. He argues that the “removal period,” and § 1231 detention, never began because this Court issued a stay of removal while it was considering his petition for review. See INA § 241 (a)(1)(B)(ii), 8 U.S.C. § 123 1(a)(1)(B)(ii).
We need not decide whether part of Sopo’s four-year detention shifted from § 1226(c) to § 1231 at some point, or the effect of the stay, because his case is now back before the BIA, which means his detention continues under § 1226(c). The parties agree on this point. Furthermore, even disregarding the six-month period in dispute, from August 10, 2015 to this Court’s remand of Sopo’s petition for review on February 2, 2016, Sopo's § 1226(c) detention has lasted three-and-a-half years.